UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| L5E, LLC, | : | CIVIL ACTION NO. _____ |
| Plaintiff | : | |
| | : | |
| V. | : | |
| | : | |
| MATTHEW SHAW and | : | |
| STANWICH ENERGY ADVISORS LLC | : | |
| | : | MAY 21, 2026 |
| Defendants. | : | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiff, L5E, LLC ("Plaintiff" or "L5E"), for its complaint against the Defendants, Matthew Shaw ("Shaw") and Stanwich Energy Advisors LLC ("Stanwich" and together with Shaw, the "Defendants"), hereby alleges as follows:

**NATURE OF THE CLAIMS**

1.     This action arises from the brazen misappropriation of L5E's valuable trade secrets, confidential business information, and proprietary source code by Matthew Shaw, L5E's former Director of Technology, and the willful complicity of his current employer, Stanwich Energy Advisors LLC.

2.     For seven years, Shaw occupied a position of extraordinary trust at L5E. As Director of Technology, he was part of a team that personally built the Level 5 platform from the ground up—the proprietary software that forms the backbone of L5E's competitive advantage in the energy advisory industry.  He had virtually unfettered access to L5E's highly confidential information: its source code, customer data, pricing strategies, and the analytical tools that distinguish L5E from its competitors.  In October 2021, Shaw abruptly resigned from L5E.  Within

weeks, he joined Stanwich—a direct competitor that had expressed interest in the capabilities of L5E's proprietary Level 5 technology.

3.      The information that Shaw had access to at L5E was extremely valuable and comprised millions of dollars of L5E's investment in building one of the nation's leading energy brokers.  L5E spent more than fourteen years and invested more than $20 million to build its business and develop the Level 5 platform and other proprietary products that differentiate it in the competitive market.

4.      Upon information and belief, Stanwich recruited Shaw precisely because of his intimate knowledge of L5E's proprietary technology and trade secrets, intending from the outset to mine and exploit that knowledge to build a copycat platform for its own commercial gain.

5.      In late March of 2026, L5E discovered that Shaw had improperly accessed L5E's confidential systems in February 2023—more than fifteen months after his employment ended— by making at least twelve unauthorized login attempts before successfully breaching the system on the thirteenth attempt.  Once inside, Shaw accessed and obtained a trove of L5E's most sensitive confidential information, including customer lists, contract data, pricing margins, sales reports, and proprietary analytics.  L5E now believes that Shaw also impermissibly retained L5E's proprietary source code when he departed L5E and misappropriated this confidential information to compete unfairly and divert customers—including one of L5E's largest customers—from L5E to Stanwich.

6.      This action seeks to hold Shaw and Stanwich accountable for their misconduct, to address the substantial harm L5E has suffered as a result of their illegal conduct, and to prevent the continued misuse of L5E's trade secrets and confidential information.

2

## THE PARTIES

7.      Plaintiff L5E is a limited liability company with its principal place of business at 4545 Fuller Dr., Suite 412, Irving, Texas 75038.  L5E is an energy advisory company that provides energy brokerage and consulting services throughout the United States.

8.      Shaw is a resident and citizen of the State of Connecticut, residing at 72 Mayweed Road, Fairfield, Connecticut 06824.

9.      Stanwich is a limited liability company with its principal place of business at 2 Greenwich Office Park, Suite 275, Greenwich, CT 06831.  Stanwich is a direct competitor of L5E that provides the same or similar services as L5E in the same markets.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) by virtue of diversity of citizenship of the parties and the fact that the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Specifically, L5E is a corporation organized under the laws of Texas, with its principal place of business located in Irving, Texas.  As noted above, Defendant Shaw is domiciled in Fairfield, Connecticut.  Defendant Stanwich is a limited liability company with a principal place of business in Greenwich, Connecticut.

11.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, the Federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g), and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c), which provides L5E with a private right of action to assert its claims against the Defendants in the federal courts of the United States.

12.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because such claims are so related to the federal claims that they form part of the same case or controversy.

13.     As both defendants are domiciled in Connecticut, this Court has personal jurisdiction over them.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. Section 1391(b)(1).

## FACTUAL ALLEGATIONS

### I.     L5E's Business and the Level 5 Platform

15.     L5E is a tech-enabled energy advisory firm that provides strategic energy procurement, risk management, and sustainability services to commercial, industrial, and public-sector customers.

16.     L5E leverages its proprietary software, Level 5, to compete in the highly competitive energy advisory market.  For customers, the platform serves as a data repository, usage analysis tool, and supercharged market analysis engine.

17.     The Level 5 platform encompasses functionalities that manage confidential and proprietary information across several key areas, including but not limited to: (a) customer management, such as customer lists, prospect lists and contacts; (b) contract management, such as contracts, renewals, expired contracts, and assignments; (c) market information, such as forward prices, historical prices, weather analytics, and capacity prices; (d) back office operations, such as customer quotes, usage and demand information, billing and deal booking data; (e) reporting, such as user statistics, proposals, and company data; (f) cash management and accounting, such as revenue, receivables, payables, financial forecasts, and commission calculations; and (g) analytics, such as power factor analysis, coincident peak analysis, and customer budgets.

18.     In essence, Level 5 stores confidential customer data, market data, usage information, and customer pricing, among other things.  It took L5E more than a decade and millions of dollars in investment to develop Level 5 and the proprietary products that are built

around this proprietary system.  As a data-driven company, Level 5 forms the foundation of L5E's energy advice and is at the core of its customized energy strategies.

19.    Level 5's design and structure incorporate critical modeling and analytical information provided by key members of L5E's team.  Level 5 was built entirely in-house by L5E's development team, which at the time was led by Shaw as Director of Technology.  In fact, Shaw personally developed the source code for Level 5.

20.    L5E's trade secrets, including the Level 5 platform, are enormously economically valuable and are critical to its business. The information in Level 5 and the way it is presented is extremely valuable to a competitor.

21.    L5E has thus taken extensive measures to protect its trade secrets and confidential information, including, *inter alia*, the Level 5 platform source code, product type, usage volume and broker margin.  As an initial matter, L5E requires its employees and referral partners to execute the Work Product and Intellectual Property Policy, committing to maintain strict confidentiality over proprietary information.  L5E also maintains a comprehensive Trade Secrets Policy that establishes procedures and practices for safeguarding its most sensitive assets. This policy mandates background screenings before employees are granted access to proprietary information, role-based access controls to prevent unauthorized system access, multi-factor authentication for all administrative access, restriction of internal resources to personnel on a "need-to-know" basis, and routine rotation of access keys, credentials, and server endpoints. The policy further requires that terminated employees be promptly offboarded and their access to Level 5 and related systems suspended.  Cybersecurity training is mandatory for all employees company wide.  Additionally, L5E protects its confidential information through platforms such as GitHub, Office365, and Amazon Web Services, adhering to each platform's recommended security best practices.  GitHub,

in particular, is used to limit access to and control the storage of internal code and documentation, and requires multi-factor authentication.

22. These protective measures were developed by L5E's Trade Secrets Committee, which Shaw, as Director of Technology, helped establish. Shaw played an integral role in drafting and implementing the Trade Secrets Policy. He also built the multifactor authentication system he then used to break into Level 5.

23. The Trade Secrets Committee is charged with ensuring that L5E takes reasonable measures to protect its trade secrets by routinely evaluating existing safeguards and identifying improvements. As a member of this Committee, Shaw participated in annual meetings focused on these ongoing protective efforts.

## II. Shaw's Employment with L5E and the Work Product and Intellectual Property Policy

24. L5E hired Shaw in May 2014 as a Senior Analyst. He was later promoted to Software Architect and then to Director of Technology.

25. As Director of Technology, Shaw held one of the most important positions at L5E. His position provided him with a unique vantage point to access the full scope of L5E's intellectual property, including its trade secrets and confidential information.

26. During his employment as Director of Technology, Shaw was personally responsible for leading the development of the Level 5 platform for over six years. He had virtually unfettered access to the most highly confidential information of L5E, including its proprietary source code, customer requirements, and contractual documents.

27. As a member of L5E's Trade Secrets Committee, and a drafter of the Trade Secrets Policy, Shaw knows the measures L5E employs to protect its trade secrets and the importance of maintaining confidentiality.

6

28.    On May 17, 2016, Shaw executed L5E's Work Product and Intellectual Property Policy (the "Agreement").   A true and correct copy of the Agreement is attached hereto as Exhibit A.

29.    As part of the measures to protect its trade secrets, including its proprietary source code and confidential information, L5E requires its employees to execute this agreement.

30.    The obligations under the Agreement survive the termination of Shaw's employment.

31.    The Agreement defines "Intellectual Property Rights" broadly to include, *inter alia*, "trade secrets, know-how, and other confidential information."

32.    The Agreement provides that all Work Product, including all Intellectual Property Rights therein, "shall be the sole and exclusive property of [L5E]."  The Agreement further states that "[t]he Work Product is and shall at all times remain the Confidential Information of [L5E]."

33.    Paragraph 4 of the Agreement requires Shaw to "maintain in confidence any information, materials, records, instruments, data, drawings, and other information related to the Work Product and Intellectual Property, unless and until [L5E] authorizes you to make such information public." The Agreement further states: "Unless disclosed by [L5E] publicly through publication or filing of applications and registrations that are available to the public, all Work Product and Intellectual Property therein shall be treated as trade secrets of [L5E]."

### III.    Stanwich's Business and Interest in Level 5

34.    Stanwich is an independent energy advisory firm that serves commercial, industrial, and retail organizations around the United States.  Like L5E, Stanwich's core services include energy procurement, sustainability solutions, utility data management, and energy efficiency consulting.

35.    Stanwich is a known competitor of L5E in the energy consulting and advising industry.

36.    On or about November 25, 2019, L5E and Stanwich executed a non-disclosure agreement (the "NDA") with a two-year term during which time, between 2019 and early 2020, L5E explored the possibility of acquiring Stanwich.  Shaw was part of L5E's M&A team that worked on the potential transaction.

37.    On or around January 7, 2020, Shaw visited Stanwich's office and demonstrated Level 5 to Stanwich's team, under the protection of the NDA.  L5E took steps to ensure no source code was shared with Stanwich in connection with this demonstration.

38.    Following this meeting one of Stanwich's founders emailed L5E "We enjoyed meeting [Shaw].  Knowledgeable and friendly and quick on his feet. To a person, we agreed our value proposition would increase substantially by having access to his/the 5 tool."

39.    Shortly thereafter, however, Stanwich informed L5E that it was not interested in selling to L5E.  The discussion about a possible acquisition ended.  By this point, however, Stanwich understood the value and capabilities of Level 5.

### IV.    Shaw's Departure from L5E

40.    On September 13, 2021, Shaw abruptly informed L5E that he was resigning.  His last day of employment was on October 1, 2021.

41.    In connection with his departure, L5E required Shaw to delete all L5E information in his possession.  This is consistent with L5E's offboarding process when employees end their employment.

42.    Prior to his departure, L5E required that Shaw provide it with the steps he took to clear his personal laptop of anything proprietary to L5E.  On October 1, 2021, Shaw represented

8

that he had removed all proprietary information from his possession and taken steps such as wiping files, disconnecting applications, and deleting passwords.

43. In or around October 2021, shortly after his departure, Shaw's public GitHub profile reflected substantial web development contributions.

44. Upon information and belief, Shaw was working with Stanwich at this time to start a GitHub repository.

45. On or around December 2, 2021, Shaw informed L5E that he had accepted employment with Stanwich—just one week after the NDA between Stanwich and L5E expired.

46. On December 10, 2021, Energy Choice Matters reported that Shaw had joined Stanwich as Managing Director, leading technology development and supporting sales.

47. Upon information and belief, Stanwich hired Shaw precisely to gain access to and exploit L5E's proprietary Level 5 platform through the unauthorized use of L5E's trade secrets, including its proprietary source code for the Level 5 technology. Stanwich knew or should have known that Shaw possessed L5E's trade secrets, including the source code he developed while employed at L5E, and hired him with the intent to benefit from those trade secrets. Shaw's role at Stanwich—leading technology development and supporting sales—placed him in a position where his knowledge of L5E's systems and information would directly benefit Stanwich's business.

48. On December 16, 2021, L5E, through counsel, sent Shaw a letter reminding him of his post-employment obligations, including his obligations under the Agreement and applicable trade secret and copyright laws. The letter warned Shaw that his position at Stanwich appeared certain to violate his legal duties to L5E. A copy of this letter was also sent to Stanwich.

9

49.    Shaw responded through counsel on January 7, 2022 assuring that he understood his ongoing obligations to L5E and that he had no need for L5E's confidential information or trade secrets to work for Stanwich.

## V.    Shaw's and Stanwich's Improper Entry into the Level 5 System and Misappropriation of L5E's Trade Secrets

50.    On March 26, 2026, L5E discovered that on February 13, 2023, around the time of a planned system migration and approximately *fifteen months* after his abrupt resignation, Shaw began attempting to improperly enter L5E's confidential Level 5 system.

51.    Shaw made at least *twelve login attempts* before he gained access to the system.

52.    One-time passcodes were sent to Shaw's cellphone number, the same number that was associated with his former employment at L5E.

53.    After the first several attempts, Shaw's login attempts became automated, occurring at five-minute intervals.  Upon information and belief, Shaw wrote a script or code to automate his login attempts to gain unauthorized access to Level 5.

54.    After twelve log-in attempts, Shaw successfully logged into the Level 5 system. The remote IP address used for this access corresponded to a location in Fairfield, Connecticut— where Shaw resides.

55.    Upon gaining improper entry into L5E's system, Shaw accessed dozens of categories of proprietary and confidential information and trade secrets.

56.    Although Shaw eventually logged out of L5E's system, upon information and belief, his log out does not establish that Shaw ceased viewing the information at that time.  Upon information and belief, the pages Shaw accessed were rendered in his web browser and remained open and viewable for any period after his logout.

57.    Furthermore, upon information and belief, Shaw downloaded, printed, screen captured, photographed, or otherwise copied this information before or after logging out of the system.

58.    By entering Level 5 years after his employment ended, Shaw was also able to observe how the system had changed since he was an L5E employee, information that is independently valuable for building a copycat platform.  From this, Shaw was able to determine what additional functionalities or improvements had been made and what new functionality Stanwich could add to divert L5E's customers and prospective customers.

59.    Shaw's improper entry into L5E's system was unauthorized, deliberate, and calculated.  He was no longer an employee of L5E, had no authorization to access the Level 5 system or any of L5E's systems, and knowingly circumvented security measures to gain entry.

60.    In addition, L5E now has reason to believe that Shaw retained L5E's proprietary source code for the Level 5 platform when he departed L5E in October 2021 and used that source code to build a substantially similar platform at Stanwich.

61.    This belief is supported by, *inter alia*, a former L5E customer's description of Stanwich's platform as "a level up in analytics and intelligence and data integrity" consistent with a platform built upon and derived from Level 5's proprietary architecture.

62.    Upon information and belief, Shaw has used, and continues to use, L5E's confidential information and trade secrets to divert L5E's customers and prospective customers to Stanwich, unlawfully utilizing this information to improperly compete against L5E.

63.    In or around July 2024, L5E learned that one of its biggest customers had left it and signed a letter of representation with Stanwich.  This customer's contract was set to end in January 2025.  Shaw's improper entry into L5E's system in February 2023 included access to data critical

to identifying and targeting this customer as a customer to divert.  Further, this customer informed L5E that Shaw led Stanwich's effort to acquire it as a customer of Stanwich.

64.    Stanwich is not an innocent bystander to these events.  Upon information and belief, Stanwich knowingly participated in, facilitated, and directly benefited from Shaw's misappropriation of L5E's confidential information and trade secrets.  Despite receiving L5E's December 2021 letter warning of Shaw's obligations to L5E, Stanwich continued to employ Shaw. Stanwich's continued employment of Shaw in this capacity, with full knowledge of L5E's concerns, enabled his improper entry into L5E's system and retention of L5E's source code for Stanwich's commercial benefit.

65.    Upon information and belief, Stanwich has and continues to benefit from a platform Shaw built using L5E's trade secrets and from the confidential information Shaw obtained through his improper entry into L5E's systems in February 2023.  This conduct demonstrates Stanwich's willful disregard of L5E's rights and its knowing participation in Shaw's misappropriation.

## VI.    L5E's Discovery of the Misappropriation and Demands to Shaw and Stanwich

66.    On or about March 26, 2026, L5E's COO, Cady Thomas, learned for the first time that although Shaw had not been an employee since 2021, his last activity date on Level 5 was February 13, 2023.

67.    This discovery immediately triggered an investigation into Shaw's and Stanwich's misconduct including Shaw's improper entry into L5E's database through the unauthorized use of secure login credentials.

68.    In connection with its investigation, L5E also reviewed Shaw's public GitHub activity.  GitHub is a cloud-based platform that allows developers to create, store, manage, and

share code.  Shaw's GitHub account showed substantial web development activity in the three months after he left L5E in 2021 to join Stanwich.

69.     Upon information and belief, Shaw and Stanwich conspired to develop a copycat Level 5 platform for Stanwich well before Shaw left L5E and immediately thereafter, with Shaw retaining L5E's proprietary source code to facilitate this scheme.

70.     L5E immediately sent cease and desist letters to Shaw and Stanwich in connection with this breach on April 10, 2026.  A true and correct copy of the cease and desist letter sent to Shaw is attached hereto as Exhibit B.  A true and correct copy of the cease and desist letter sent to Stanwich is attached hereto as Exhibit C.

71.     On or around April 17, 2026, Stanwich responded by email requesting additional time to respond.  On or around April 21, 2026, Stanwich responded by letter denying any knowledge of Shaw's breaches or access to L5E's proprietary and confidential information or trade secrets.  A true and correct copy of Stanwich's response letter is attached hereto as Exhibit D.

72.     Despite being put on notice multiple times about concerns with Shaw's employment, Stanwich continued to employ Shaw in a management position, where he had customer-facing responsibilities and performed essentially the same role he performed at L5E.

73.     Stanwich further denied that Shaw played any role in soliciting one of L5E's largest customers in July 2024, a denial that L5E has reason to believe is false.  To the contrary, this client has advised that Shaw *led* Stanwich's efforts to acquire it as a customer.

74.     Shaw responded on or around April 27, 2026, admitting that he accessed L5E's system without permission or authorization.  A true and correct copy of Shaw's response letter is attached hereto as Exhibit E.  Shaw's purported defense for accessing the system was that "he was feeling nostalgic."

75.     Despite Shaw's blatant admission to improperly entering L5E's system and reviewing and obtaining L5E's confidential and proprietary information, Stanwich has not provided any evidence that it has taken reasonable steps to protect L5E's rights, that it has investigated Shaw's conduct, or that it has ceased using L5E's misappropriated trade secrets in its competing platform.

### VII.   L5E's Trade Secrets

76.     The information misappropriated by Shaw and Stanwich constitutes trade secrets under both federal and Connecticut law.  L5E's trade secrets include, but are not limited to: the structure of Level 5 (including the way it presents information to customers and prospects), the Level 5 platform's source code, customer lists and related data, contract terms, margins, pricing data, customer usage and demand information, forward pricing models and analytics, business strategies and sales methodologies, employee information, and financial forecasting and reporting data.

77.     L5E's proprietary technology and confidential information constitute information with enormous economic value.  The proprietary technology and confidential information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by L5E's competitors, or other persons who can obtain economic value from its disclosure or use.

78.     At all times relevant herein, L5E has taken reasonable measures to protect the secrecy of this information, including but not limited to: requiring employees to execute the Work Product and Intellectual Property Policy, establishing a Trade Secrets Policy, forming a Trade Secrets Committee, implementing cybersecurity training, deploying multifactor authentication,

offboarding terminated employees by removing access to systems like Level 5, and limiting employee access to Level 5 on a need-to-know basis.

79. The Defendants' misappropriation of L5E's confidential information and trade secrets has caused irreparable harm to L5E.

80. But for Shaw's misappropriation of L5E's trade secrets—including his use of confidential information and his retention of source code and improper entry into L5E's systems—to create a copycat version of the Level 5 platform, L5E's customer that departed in July 2024 would have remained a client.

81. Upon information and belief, but for Stanwich's knowing receipt and use of L5E's confidential information and trade secrets—including Shaw's retained source code and the information obtained through Shaw's improper entry—to create a copycat Level 5 platform, L5E's customer that departed in July 2024 would have remained an L5E client.

82. Shaw has unjustly enriched himself through this theft and misappropriation of L5E's proprietary and confidential information and trade secrets.

83. Upon information and belief, Stanwich has unjustly enriched itself through its knowing receipt of, and benefit from, L5E's proprietary and confidential information and trade secrets, including source code retained by Shaw at his departure and information obtained through Shaw's improper entry into L5E's systems in February 2023.

## COUNT I
### Breach of Contract (Shaw)

84. L5E repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

85. On or around May 17, 2016, Shaw entered into the Work Product and Intellectual Property Policy with Plaintiff.

86.     The Agreement is a valid, binding, and enforceable contract between the parties.

87.     L5E has performed all of its obligations, covenants, and conditions under the Agreement.

88.     Shaw's obligations in the Agreement survive termination of his employment with L5E.

89.     Paragraph 5 of the Agreement states, "In addition to any other obligations you may have to [L5E] under applicable laws or pursuant to separate agreements, you are expected to maintain in confidence any information, materials, records, instruments, data, drawings, and other information related to the Work Product and Intellectual Property, unless and until [L5E] authorizes you to make such information public.  Unless disclosed by [L5E] publicly through publication or filing of applications and registrations that are available to the public, all Work Product and Intellectual Property therein shall be treated as trade secrets of [L5E]."

90.     L5E has never authorized Shaw to publicize its Work Product and Intellectual Property, and L5E has not publicly disclosed such information.

91.     More than fifteen months after the termination of his employment, Shaw, without authorization and in breach of the Agreement's confidentiality and non-use obligations, improperly entered L5E's electronic system to obtain L5E's confidential Work Product and Intellectual Property that he was obligated to keep confidential and not use.

92.     After improperly entering L5E's systems, Shaw opened, reviewed, and upon information and belief, downloaded, printed, took screenshots of, emailed, and/or otherwise copied or retained L5E's confidential Work Product and Intellectual Property, and used and/or disclosed that information to compete unfairly with L5E, including by assisting Stanwich in building a

16

competing platform and soliciting L5E's customers, all in violation of the Agreement's confidentiality and non-use provisions.

93.    Shaw's conduct constitutes a clear and material breach of the Agreement.

94.    As a direct and proximate result of Shaw's material breach, L5E has suffered and continues to suffer monetary harm and damages in an amount to be determined at trial.

## COUNT II
### Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (All Defendants)

95.    L5E repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

96.    As set forth above, L5E owns and possesses confidential, proprietary and trade secret information, including but not limited to the Level 5 platform's source code, customer lists and related data, contract terms, margins, and pricing data, customer usage and demand information, forward pricing models and analytics, business strategies and sales methodologies, employee information, and financial forecasting and reporting data. This information constitutes L5E's confidential and proprietary information and trade secrets, the secrecy of which L5E has taken reasonable measures to maintain as defined in 18 U.S.C. § 1839(3), including requiring employees to execute the Work Product and Intellectual Property Policy, establishing a Trade Secrets Policy, forming a Trade Secrets Committee, implementing cybersecurity training, deploying multifactor authentication, offboarding terminated employees by removing access to systems like Level 5, limiting employee access to Level 5 on a need-to-know basis, and utilizing secure platforms such as GitHub to limit access to and control the storage of internal code and documentation.

97.    L5E's trade secrets derive independent economic value from not being generally known to, or readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

98.    L5E's proprietary and confidential information and trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

99.    As set forth above, Defendant Shaw acquired L5E's proprietary and confidential information and trade secrets on or around February 13, 2023 by improper means after accepting the obligations in the Agreement with L5E, including by breaching his contractual duty of confidentiality and non-use under the Agreement and accessing L5E's systems without permission.

100.    As set forth above, on or around February 13, 2023, Shaw improperly accessed and obtained a substantial amount of confidential and proprietary information including, *inter alia*, employee information, customer information, sales reports, and margin data.

101.    As set forth above, upon information and belief Shaw retained L5E's proprietary source code for the Level 5 platform at the time he departed L5E.

102.    At all relevant times, Shaw knew or had reason to know that his access, acquisition, disclosure, and/or use of L5E's trade secrets was obtained through improper means or in breach of a duty to maintain secrecy and limit use.

103.    Upon information and belief, Defendant Shaw has misappropriated, disclosed, and/or used L5E's proprietary and confidential information and trade secrets without L5E's express or implied consent and, at the time of such acquisition, disclosure and/or use, knew or had reason to know that the information was a trade secret acquired through improper means or in breach of a duty to L5E.

18

104.    Upon information and belief, Defendant Shaw disclosed L5E's proprietary and confidential information and trade secrets to Defendant Stanwich.

105.    Upon information and belief, Defendant Stanwich acquired L5E's proprietary and confidential information and trade secrets from Defendant Shaw—whom it knew or had reason to know owed a duty to L5E to maintain secrecy and limit use—and Stanwich knew or had reason to know that such information was acquired by Shaw through improper means or in breach of those duties.  Stanwich actively received, incorporated, and exploited this information in connection with its own competing platform and customer solicitation efforts.

106.    Upon information and belief, Stanwich has acquired and/or used L5E's proprietary and confidential information and trade secrets to unfairly compete with L5E.

107.    By acquiring, using and/or disclosing such trade secrets that were derived from or through Defendant Shaw — a person who owed a duty to L5E to maintain the secrecy and limit use—and with knowledge or reason to know of that duty and the improper means by which they were acquired, Defendant Stanwich misappropriated L5E's proprietary and confidential information and trade secrets.

108.    Shaw was acting within the scope of his employment at Stanwich when he accessed L5E's protected computer on February 13, 2023.  Shaw's misappropriation of L5E's trade secrets from L5E's computer system was in furtherance of Stanwich's business.  Stanwich is thus vicariously liable for Shaw's misappropriation.

109.    These actions by Shaw and Stanwich constitute misappropriation of trade secrets in violation of the DTSA.

110.    Shaw's and Stanwich's misappropriation was willful, intentional, and purposeful, and in complete disregard of L5E's rights.

111.    Defendants continue to violate and to financially gain from the misappropriation of L5E's protected trade secrets.

112.    As a direct and proximate cause of Defendant Shaw's misappropriation of L5E's proprietary and confidential information and trade secrets, L5E has suffered, and will continue to suffer, monetary damages.

113.    As a direct and proximate cause of Defendant Stanwich's misappropriation of L5E's proprietary and confidential information and trade secrets, L5E has suffered, and will continue to suffer monetary harm and damages in an amount to be determined at trial.

114.    As such, pursuant to 18 U.S.C. § 1836(b)(3)(B), L5E is entitled to recover from Defendants for its damages for actual loss caused by the misappropriation of its proprietary and confidential information and trade secrets.

115.    In addition, pursuant to 18 U.S.C. § 1836(b)(3)(B), L5E is entitled to recover damages from Defendants for any unjust enrichment caused by the misappropriation of proprietary and confidential information and trade secrets that is not addressed in computing damages for actual loss.

116.    Alternatively, pursuant to 18 U.S.C. § 1836(b)(3)(B), in lieu of damages measured by any other methods, L5E is entitled to recover from Defendants damages caused by the misappropriation of L5E's trade secrets measured by imposition of liability for a reasonable royalty for the Defendants' unauthorized disclosure or use of the trade secret.

117.    As set forth above, Defendants' misconduct was willful and malicious within the meaning of 18 U.S.C. § 1836(b)(3)(C), and as such L5E is entitled to an award of exemplary damages in an amount not more than 2 times the amount of the damages awarded under 18 U.S.C. § 1836(b)(3)(B), and attorney's fees in accordance with § 1836(b)(3)(D).

118.    As a direct and proximate cause of Defendants' conduct, L5E has suffered and will continue to suffer irreparable financial loss, loss of goodwill and loss of confidentiality of its proprietary and confidential information, including its trade secrets.

119.    As such, pursuant to 18 U.S.C. § 1836(b)(3)(A), L5E is entitled to a permanent injunction enjoining Defendants from engaging in any further or threatened misappropriation of its proprietary or confidential information and trade secrets.

## COUNT III
**Violation of Connecticut's Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 *et seq.*
("CUTSA")
(All Defendants)**

120.    L5E repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

121.    As set forth above, L5E owns and possesses certain confidential, proprietary and trade secret information, including but not limited to the Level 5 platform's source code, customer lists and related data, contract terms, margins, and pricing data, customer usage and demand information, forward pricing models and analytics, business strategies and sales methodologies, employee information, and financial forecasting and reporting data.

122.    As set forth above, L5E devoted substantial time, effort and independent investment to develop its confidential information, trade secrets and intellectual property related to L5E's Level 5 platform.

123.    L5E's confidential information and trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from the disclosure or use of the information.

124.    L5E has taken reasonable measures to keep this information secret, including requiring employee and third-party non-disclosure and invention-assignment agreements, restricting access on a need-to-know basis, password-protecting and logging access to code repositories and files, marking documents "confidential", and implementing onboard and offboarding procedures and confidentiality reminders.

125.    Accordingly, L5E's source code for the Level 5 platform, customer lists and related data, contract terms, margins, and pricing data, customer usage and demand information, forward pricing models and analytics, business strategies and sales methodologies, employee information, and financial forecasting and reporting data are "trade secrets" within the meaning of Conn. Gen. Stat. § 35-51(d).

126.    As set forth above, Shaw entered into the Agreement in connection with his employment at L5E, which requires that he maintain confidentiality of L5E's Work Product and Intellectual Property, which constitute its trade secrets.

127.    As set forth above, after his employment ended, Shaw acquired L5E's confidential Work Product and Intellectual Property, including its trade secrets, without consent by "improper means," including by breaching contractual obligations and common law duties of confidentiality and non-use and by exceeding his authorized access to L5E's systems.

128.    Upon information and belief, Shaw disclosed and used, and continues to disclose and use, L5E's trade secrets and confidential information without L5E's consent.  At all relevant times, Shaw knew or had reason to know that his acquisition, disclosure, and/or use of the trade secrets was by improper means or in breach of a duty to maintain secrecy and limit use.

129.    Upon information and belief, Shaw unlawfully disclosed L5E's trade secrets and confidential information to Stanwich.

130. Upon information and belief, Stanwich acquired such proprietary and confidential information and trade secrets from Defendant Shaw—whom it knew or had reason to know owed a duty to L5E to maintain secrecy and limit use—and Stanwich knew or had reason to know that such information was acquired by Shaw through improper means or in breach of those duties.

131. Upon information and belief, Stanwich has used L5E's proprietary and confidential information and trade secrets without L5E's consent and for its own gain to unfairly compete, including by incorporating such information into its competing platform and using it to solicit L5E's customers.

132. By acquiring, disclosing, and/or using L5E's trade secrets without consent, Shaw and Stanwich have misappropriated L5E's trade secrets in violation of CUTSA.

133. Shaw was acting within the scope of his employment at Stanwich when he accessed L5E's computer system on February 13, 2023 and acquired L5E's trade secrets. Shaw's misappropriation of L5E's trade secrets was in furtherance of Stanwich's business. Stanwich is thus vicariously liable for Shaw's misappropriation.

134. As set forth above, Shaw's and Stanwich's misappropriation of L5E's confidential information and trade secrets was intentional, knowing, willful, malicious and oppressive.

135. As a direct and proximate cause of Shaw's and Stanwich's misappropriation, L5E has suffered and will continue to suffer substantial damages, including but not limited to actual loss and Defendants' unjust enrichment not taken into account in computing the actual loss pursuant to Conn. Gen. Stat. § 35-53(a).

136. As a result of Shaw's and Stanwich's willful and malicious misappropriation of its trade secrets, L5E is entitled to punitive damages, pursuant to Conn. Gen. Stat. § 35-53(b), by the

doubling of damages awarded to L5E under Conn. Gen. Stat. § 35-53(a).  Further, L5E is entitled, under Conn. Gen. Stat. § 35-54, to an award of its attorneys' fees.

137.    As a direct and proximate cause of Shaw's and Stanwich's conduct, L5E has suffered and will continue to suffer irreparable financial loss, loss of goodwill and loss of confidentiality of its proprietary and confidential information, including its trade secrets.

138.    As such, pursuant to Conn. Gen. Stat. § 35-52, L5E is entitled to a permanent injunction enjoining Shaw and Stanwich from engaging in any further actual or threatened misappropriation of L5E's confidential information and trade secrets.

## COUNT IV
### Violations of Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* (All Defendants)

139.    L5E repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

140.    Shaw has violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing a computer used for interstate commerce or communication, without authorization or by exceeding authorization, and by obtaining information from such a protected computer.

141.    L5E's computer system, including the Level 5 platform, is a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2) because it is used in and affects interstate and/or foreign commerce by reason of, at least, being connected to the internet.

142.    In violation of 18 U.S.C. § 1030(a)(2)(C) and (a)(4), Shaw intentionally and deceptively accessed L5E's confidential, proprietary, and trade secret information through the Level 5 system for the express and unauthorized purpose of accessing, obtaining, downloading, and/or retaining such information.

143. Shaw knowingly, and with intent to defraud L5E, accessed L5E's protected computer, without authorization or exceeding authorization, to such a computer, and by means of such conduct furthered the intended fraud and obtained L5E's confidential information and trade secrets.

144. At all times following his departure from L5E in October 2021, Shaw was not authorized to access L5E's protected computer, including the Level 5 platform.

145. On or around February 13, 2023, Shaw accessed L5E's protected computer without authorization and impermissibly obtained L5E's confidential information and trade secrets.

146. Shaw knowingly attempted to log into the Level 5 platform at least thirteen times using an L5E email address, despite knowing he had not been an L5E employee in years.

147. On or around March 26, 2026, L5E discovered Shaw's unauthorized access for the first time.

148. Upon information and belief, Stanwich, as Shaw's employer, directed, encouraged, and/or induced Shaw to access L5E's Level 5 platform without authorization for Stanwich's benefit.

149. Shaw was acting within the scope of his employment at Stanwich when he accessed L5E's Level 5 platform on February 13, 2023, and has continued to act within the scope of such employment.

150. Upon information and belief, Shaw accessed L5E's protected computer to obtain L5E's confidential trade secret information for Stanwich's benefit so that it could build a competing copycat version of the Level 5 platform.

151. Shaw's unauthorized access to the Level 5 platform was in furtherance of Stanwich's business.

152.    Stanwich is thus vicariously liable for Shaw's unauthorized entry.

153.    Furthermore, upon information and belief, Stanwich conspired with Shaw to impermissibly access L5E's confidential computer in violation of 18 U.S.C. § 1030(b).

154.    Upon information and belief Stanwich and Shaw communicated and agreed that Shaw would use his technical expertise and prior connection to L5E to access information from L5E's protected computer to assist Stanwich in the development of a copycat version of the proprietary Level 5 platform.

155.    L5E has suffered damages and/or losses as a result of these violations.

156.    The loss caused by Shaw's actions substantially exceeds $5,000 in value during any 1-year period.

157.    Pursuant to 18 U.S.C. § 1030(g), L5E is entitled to recover compensatory damages and injunctive relief prohibiting Shaw and Stanwich from further violations of the CFAA, and from using the data it wrongfully obtained from L5E's system.

## COUNT V
### Conn. Gen. Stat. § 52-570b Unauthorized Use of a Computer (All Defendants)[1]

158.    L5E repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

159.    Approximately two years after Shaw ended his employment with L5E, Shaw accessed L5E's computer system without L5E's knowledge or permission.

160.    Shaw knew that he was not authorized to access L5E's system as he was no longer an L5E employee.

---

[1] L5E pleads this claim to address Defendants' wrongful conduct and L5E's injuries independent of the acquisition, disclosure, or use of trade secrets or confidential information, including Defendants' unauthorized system entry, circumvention of access controls, and computer system misuse, to the extent not already covered by the CUTSA claims set forth at Count III.

161.    As a result of such access, Shaw intentionally made an unauthorized display, use, disclosure, or copy of data residing in, communicated by, or produced by that computer system in violation of Conn. Gen. Stat. § 53a-251(e)(1).

162.    Shaw intentionally or recklessly and without authorization, took data intended for use by the L5E system, whether residing within or external to that computer system in violation of Conn. Gen. Stat. § 53a-251(e)(2).

163.    Shaw knowingly retained data obtained in violation of Conn. Gen. Stat. § 53a-251(e)(1) and/or (2), and used and disclosed data that he knew or believed was obtained from L5E's computer system without authorization and in violation of Conn. Gen. Stat. § 53a-251(e)(1) and/or (2), in violation of § 53a-251(4).

164.    Shaw's wrongdoing included the unauthorized entry into L5E's protected systems, repeated and automated login attempts, circumvention of access controls, and the resulting misuse of L5E's computer system.

165.    Shaw acted willfully and maliciously.

166.    Shaw has therefore committed the offense of misuse of computer system information against L5E under Conn. Gen. Stat. § 53a-251.

167.    Upon information and belief, Shaw accessed L5E's computer systems at the direction of, on behalf of, or with the knowledge and acquiescence of Stanwich, which stood to benefit from the information obtained.

168.    Shaw was acting within the scope of his employment for Stanwich at the time he accessed L5E's system, and did so for Stanwich's benefit.   Stanwich is thus vicariously liable for Shaw's conduct.

169.    Upon information and belief, as a result of Shaw's accessing L5E's computer system, Stanwich made an unauthorized display, use, disclosure or copy, in any form, of data residing in, communicated by or produced by the L5E computer system.

170.    Stanwich did so willfully and maliciously.

171.    Upon information and belief, Stanwich's and Shaw's access to L5E's protected computer without authorization caused L5E to investigate, assess, contain, and remediate the unauthorized access and related security risks.

172.    Upon information and belief, Stanwich knowingly received or retained data obtained in violation of Conn. Gen. Stat. § 53a-251(e)(3), as set forth above.

173.    Upon information and belief, Stanwich used and disclosed (and continues to use and disclose) data it knew or believed was obtained in violation of Conn. Gen. Stat. § 53a-251(e)(4), as set forth above.

174.    To the extent Stanwich, as Shaw's employer at the time of access, is not directly liable for accessing L5E's confidential information and trade secrets without authorization, it is vicariously liable for directing, encouraging, or inducing Shaw to do so for Stanwich's benefit.

175.    In accordance with Conn. Gen. Stat. § 52-570b, L5E is an aggrieved person who may bring this action.

176.    L5E has suffered and continues to suffer actual loss as a result of Shaw's and Stanwich's unauthorized computer conduct, including costs to investigate the breach, assess system exposure, preserve evidence, evaluate credential and access control failures, mitigate security risks, and respond to the intrusion, in an amount to be determined at trial.

177.    L5E is also entitled to a permanent injunction restraining Shaw and Stanwich from further violations, restitution,  and monetary damages to be determined at trial.

28

## COUNT VI
### Violation of Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110 *et seq*. ("CUTPA") (All Defendants)[2]

178.    L5E repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

179.    L5E is a person within the meaning of Conn. Gen. Stat. § 42-110a(3) and Conn. Gen. Stat. § 42-110g(a) and is entitled to bring action under CUTPA.

180.    At all relevant times, Defendants Shaw and Stanwich were persons acting in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. § 42-110a *et. seq*. including by marketing, soliciting customers for, offering, selling, and providing technology products and related services in competition with L5E.

181.    In addition to misappropriating L5E's trade secrets and confidential information, Defendants engaged in deceptive marketplace conduct by soliciting L5E customers and marketing Stanwich's competing technology and services as Stanwich's own independently developed, lawfully owned, and lawfully authorized offering, while concealing material facts concerning the source, development, ownership, authorization, and competitive basis of Stanwich's platform.

182.    At all relevant times, Shaw and Stanwich knew of Level 5's commercial value.

183.    Upon information and belief, beginning in or around October 2021 and continuing through the present, Shaw—who created L5E's Level 5 platform while employed by L5E—has worked with Stanwich to build a copycat version of the Level 5 platform for Stanwich's commercial benefit.

---

[2] L5E pleads this claim to address Defendants' wrongful conduct and L5E's injuries independent of the acquisition, disclosure, or use of trade secrets or confidential information, including Defendants' customer-facing misrepresentations, omissions, and deception, to the extent not already covered by the CUTSA claims set forth at Count III.

184. On or around December 16, 2021, L5E warned Shaw and Stanwich that Shaw's role at Stanwich created serious concerns about his ability to comply with his ongoing obligations to L5E.

185. On or around February 13, 2023, Shaw accessed L5E's systems without authorization and obtained material information.

186. In July 2024, one of L5E's largest customers left L5E to join Stanwich. Upon information and belief, Shaw was instrumental in soliciting and signing this client with Stanwich and played a direct role in the sales and marketing process.

187. Shaw and Stanwich were able to successfully solicit this customer by offering a copycat version of the Level 5 platform that Defendants could not fairly offer absent improper conduct. The copycat platform had functionality not available in the original Level 5, and Defendants used this to induce L5E's customer to move its business from L5E to Stanwich.

188. This customer represented to L5E that it joined Stanwich because of what Stanwich offered through the copycat Level 5 platform.

189. L5E now also has reason to believe that Shaw retained Level 5 source code at the time of his departure from L5E.

190. Thus, from at least July 2024 and continuing through the present, Stanwich and Shaw have marketed, sold, and commercialized a copycat version of the Level 5 platform for Stanwich's commercial benefit.

191. Upon information and belief, in so doing, Defendants have represented, either expressly or by omission, that Stanwich independently owned and was authorized to offer a copycat Level 5 platform. Upon information and belief, Defendants continue to market, sell, and promote the benefits of Stanwich's copycat platform to customers and prospective customers while

representing, expressly or by omission, that Stanwich independently owns or is authorized to offer the platform. Defendants' marketplace conduct, including passing off the copycat Level 5 platform as Stanwich's own, misrepresenting the origin and authorization of the technology offered, omitting material facts about the source and development of the platform, and enhancing and promoting the platform to solicit and divert L5E customers, constitutes a continuing course of unfair and deceptive conduct. This conduct offends public policy and is immoral, unethical, oppressive, or unscrupulous under CUTPA's "cigarette rule." These practices are likely to mislead customers in a manner material to their purchasing decisions. L5E has suffered ascertainable loss as a direct result of Defendants' unfair and deceptive conduct, including but not limited to the loss of at least one customer, associated revenue, and the costs of investigating and responding to Defendants' marketplace misconduct. L5E is thus entitled to recover damages arising out of Defendants' conduct.

192.    As a direct and proximate result of Defendants' continuing unfair and deceptive acts and practices, L5E has suffered and continues to suffer ascertainable losses within the meaning of Conn. Gen. Stat. § 42-110g(a), and said unfair and deceptive conduct has the effect of causing L5E to continue to suffer losses of money and/or property.

193.    In addition, Defendants' actions show calculated, deceitful and unfair conduct, and reckless indifference to L5E's rights, entitling L5E to punitive damages in accordance with Conn. Gen. Stat. § 42-110g(a).

194.    Pursuant to Conn. Gen. Stat. § 42-110g(a)-(d), L5E is entitled to recover actual damages, punitive damages, injunctive relief, costs, and reasonable attorney's fees.

195.    In accordance with Conn. Gen. Stat. § 42-110g(c), a copy of this Complaint is being mailed to the Attorney General of the State of Connecticut and the Commissioner of Consumer Protection of the State of Connecticut.

## PRAYER FOR RELIEF

WHEREFORE, L5E respectfully prays that this Court enter judgment in its favor and against Defendants Matthew Shaw and Stanwich Energy Advisors LLC, and grant the following relief:

A.  Monetary damages;

B.  Punitive and exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C); Conn. Gen. Stat. § 35-53(b); Conn. Gen. Stat. § 52-570b(c), and Conn. Gen. Stat. § 42-110g(a);

C.  Disgorgement and an accounting of any gain received, directly or indirectly, by Defendants by virtue of the wrongful acts described herein;

D.  Unjust enrichment damages in accordance with 18 U.S.C. § 1836(b)(3)(B), Conn. Gen. Stat. § 35-53(a); and Conn. Gen. Stat. § 52-570b(c);

E.  Alternatively, reasonable royalty in accordance with 18 U.S.C. § 1836(b)(3)(B);

F.  Permanent injunction restraining and enjoining Defendants from using, disclosing, or further converting in any manner or in any form any of L5E's confidential, proprietary, or trade secret information;

G.  Attorney's fees and costs in accordance with 18 U.S.C. § 1836(b)(3)(D), Conn. Gen. Stat. § 35-54; Conn. Gen. Stat. § 52-570b(e), and Conn. Gen. Stat. § 42-110g(d);

H.  Pre-judgment and post-judgment interest; and

I.  Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, L5E, hereby demands a trial by jury on all issues raised herein that are triable to

a jury under applicable law.

THE PLAINTIFF

L5E, LLC


By_____/s/ *Lisa A. Zaccardelli*_____
      Lisa A. Zaccardelli, Esq. (ct07983)
      HINCKLEY ALLEN & SNYDER, LLP
      20 Church Street
      Hartford, Connecticut 06103
      lzaccardelli@hinckleyallen.com
      Telephone: (860) 331-2700
      Facsimile: (860) 278-3802
      Its Attorneys